## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| KEVIN TAYLOR, | |
| and | **COMPLAINT** |
| MICHELLE ROMAK | JURY DEMANDED |
|     Plaintiffs, | Case No. _____ |
| vs. | Honorable Judge _____ |
| SHELL PLC, | Magistrate Judge _____ |
| and | |
| SHELL USA Inc., | |
| and | |
| WAYNE HUNT | |
|     Defendants. | |

Plaintiffs Kevin Taylor and Michelle Romak, by and through their undersigned counsel, hereby allege and state as follows:

### INTRODUCTION

1.      Mr. Taylor is an experienced corporate security professional who has worked for Shell USA for 16 years. He has been employed by Shell USA, Inc., in the Corporate Security Division (U.S.CS), based in Houston, Texas, since November 16, 2021. Mr. Taylor is an American Citizen and a White male.

2.     Ms. Romak is an experienced corporate security professional who has worked for Shell Energy Resources, Shell Exploration & Production, Shell Pipeline and Shell USA, Inc. for the last 17 years. She has been employed in the Corporate Security Division (U.S.CS), based in Houston, Texas, since August 1, 2022. Ms. Romak is an American citizen, a White female, and a Military Veteran who served in a time of war.

3.     Mr. Hutt has been a Shell employee for nearly fifteen (15) years. He has held the position of Country Security Manager for Shell USA, Inc., based in Houston, for over eight (8) years. Mr. Hutt is an American Citizen, a White male, and a Military Veteran who served during the Cold War.

4.     On January 9, 2025, Mr. Hunt, Regional Security Manager (RSM) for Corporate Security Americas, announced a pretextual departmental reorganization, which was racially discriminatory.

5.     This reorganization eliminated the three White employees from the Corporate Security Division (U.S.CS) at Shell, USA, Inc. in Houston, Texas, and replaced each with someone of color with less experience and objectively weaker qualifications.

6.     Further, the people of color already working in Corporate Security during this reorganization were not subject to the same requirements and processes as the three White employees.

7.     Each replacement had lesser qualifications than the White employee

they replaced.

8.    Instead of selecting the more qualified Mr. Taylor or Ms. Romak, Ms. Chevez, a Hispanic female with a background as an administrative assistant was given the Houston-based Security Advisor South role.

9.    Ms. Velazquez, a Hispanic female, was initially assigned the Security Advisor West role, which Mr. Taylor applied for. However, Ms. Velazquez was ultimately found unqualified for this U.S. based role because she was a foreign national lacking U.S. citizenship, and she had to be replaced.

10.   Mr. Hunt then promoted Ms. Velazquez to the Country Security Manager for Mexico.

11.   Thereafter, instead of selecting the most qualified for the Security Advisor West role (Mr. Taylor, who was already passed over for the Houston-based role), Mr. Hunt awarded the position to Mr. Erazo, a Hispanic male, even though Mr. Erazo was a contractor, not a Shell employee.

12.   Mr. Erazo's contract had been in the process of being terminated in December of 2024 for poor performance.

13.   Mr. Jackson, an African American male with no background in the protection of persons and assets, or in executive protection, replaced Mr. Hutt as U.S. Country Security Manager.

14.   Mr. Hunt awarded Mr. Taylor a less desirable position as Security Advisor East within Corporate Security in a different region, necessitating his

relocation to Pennsylvania or New Jersey, away from Headquarters.

15.    Mr. Hunt terminated Ms. Romak as part of this same reorganization (after passing over her for the Houston-based role), and her last day of employment with Corporate Security at Shell USA Inc. was May 31, 2025.

16.    On or about May 19, 2025, anticipating Ms. Romak's departure, Mr. Hunt bought and gifted Ms. Romak a "tear jar."



17.    Mr. Hunt also terminated Mr. Hutt (White), Ms. Romak and Mr. Taylor's Line Manager, in this reorganization. His last day of employment with Corporate Security at Shell USA Inc. was May 31, 2025.

18.    On or about May 19, 2025, anticipating Mr. Hutt's departure, Mr. Hunt also bought and gifted him another "tear jar."

19.     A tear jar is a vessel designed to collect and save the tears of someone experiencing grief, and here, the gift was intended to humiliate and mock two employees who had just lost their jobs in a racially discriminatory reorganization. This is evidence of conduct that is callous, willful and wanton .

20.     Additional evidence of willful and wanton conduct includes Mr. Taylor asking for leave for bereavement on July 10, 2025, due to the death of his mother, and an hour or so later, Mr. Hunt sent out his Approval of Mr. Taylor's transfer on an "expedited" basis.

21.     Mr. Taylor had been seeking to avoid the transfer to Pennsylvania, and the prospect of a forced transfer caused him great stress, which was increased by Mr. Hunt's callous actions.

## NAMED PARTIES

22.     Plaintiff Romak is a Texas citizen whose primary residence is in Katy, Texas.

23.     Plaintiff Taylor is a Texas citizen whose primary residence is in Sugar Land, Texas.

24.     Defendant Shell PLC is a multinational energy company that maintains its Corporate Headquarters at Shell Centre, London, SE1 7NA, United Kingdom.

25.     Defendant Shell PLC is incorporated in the United Kingdom with over 500 employees.

26.     Defendant Shell USA, Inc. (Shell USA) is a wholly owned United States

subsidiary of Shell PLC and maintains its United States Corporate Headquarters at 150 North Dairy Ashford Road, TX 77079.

27.     Defendant Shell USA is incorporated in Delaware with over 500 employees.

28.     Defendant Hunt was and continues to serve as the Regional Security Manager for Corporate Security at Shell, USA. Mr. Hunt, as the RSM, oversees the Americas staff who are to ensure the security of Shell's personnel, assets, and operations in the country for Shell, USA.

29.     At all times relevant here, Mr. Hunt was the RSM who oversaw the reorganization in Corporate Security, managed it, and led the panel on the hiring and employment practices at issue, while at all relevant times, reporting to Mr. Manning, Corporate Security Vice President, in the U.K.

## JURISDICTION

30.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the federal claims arise under the Constitution and laws of the United States, including Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. §1981.

31.     Also, Ms. Romak has claims under Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA), Pub. L., No. 93–508, 88 Stat. 1578 (1974), and Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

32.     Ms. Romak thus seeks compensatory and punitive damages under

VEVRAA, Pub. L., No. 93–508, 88 Stat. 1578 (1974).

33.    Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b)(1)-(2) because the alleged unlawful employment practice occurred in this judicial district and the employment records relevant to this dispute lie in this judicial district. This district is also where the Defendants maintain their principal office in the United States.

34.    Plaintiffs seek compensatory and punitive damages under 42 U.S.C. § 2000e *et seq*. and § 1988.

35.    Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201, 2202 to include remediation.

## SHELL'S DIVERSITY EFFORTS

36.    Shell's website highlights "some of the things we're doing" to shape the workforce, including promotion, hiring, and employment practices motivated by individuals' immutable race and sex characteristics.[1]

37.    Shell unabashedly maintains "pillars and aspirations" to hire and promote individuals based on immutable characteristics.

38.    Shell has established a "Global Council for Race," which seeks to ensure that the race and sex-based makeup of its workforce "better reflects the communities in which [it] works."

---

[1] Shell.com/who-we-are/diversity-equity-and-inclusion.html#iframe=L2RlaS8=
(May 28, 2025), https://perma.cc/2SXV-MEM9

39.    Shell also admits to maintaining "race and ethnicity action plans."[2]

40.    Further, Shell admits and affirms that it knowingly and intentionally uses race, color, and sex as motivating factors in its employment practices in the Shell Annual Report and Accounts for 2024.

41.    Shell uses extensive internal reporting to document progress towards its goals, which include illegal racial quotas.

42.    Shell maintains a Council supported by a global Employee Advisory Board with employees from deliberately selected diverse backgrounds that "was set up to ensure our race and ethnicity action plans are shaped by the voices and experiences of colleagues at Shell."

43.    Shell stated in its 2024 annual report that "through racial and ethnic representation across our workforce, we aim to reflect the communities in which we work."

44.    Shell aims to maintain or exceed having at least one Board member from an ethnic minority background, while acknowledging that this may not be achieved in periods of Board change.

45.    As of December 31, 2024, the Board had three members who identify as being from an ethnic minority group and one EC member who identifies as being from an ethnic minority group.

---

[2] Shell.com/who-we-are/diversity-equity-and-inclusion/race-and-ethnicity.html (May 28, 2025), https://perma.cc/2YAX-P3MQ (emphasis added).

46.    As of the end of 2024, 15% of Shell's Senior Management identified as being from an ethnic minority group.

47.    Shell further states, "**Shell aims to achieve 15% ethnic minority group representation in its Senior Management [B] by 2027.**"

48.    Shell's leadership is primarily based in the U.K.

49.    As relevant background, Mr. Hunt and Mr. Manning served in the British Military together.

50.    Mr. Hunt, the RSM, reports to Mr. Manning in the U.K.

51.    Shell has provided no training or education to Plaintiffs in Corporate Security at Shell USA, Inc., as employees based in the United States, to explain civil rights laws in the United States versus those of the U.K., and how race cannot be used as a motivating factor in employment practices in the United States.

## BACKGROUND

52.    According to Shell's policies, a reorganization at Shell USA must go through Human Resources.

53.    Standard Procedure for the U.S. CS reorganization should have started with offering the new regional positions to existing staff on the Corporate Security Team.

54.    Standard procedures include the application of an "incumbent preference," which requires that Shell employees wishing to remain in their current

roles be listed as the preferred candidate for that role.

55.    During a standard reorganization, a current Shell employee must be selected for any role to which at least one Shell employee applied. This is known as the "employee preference."

56.    In other words, if a current Shell employee and an outside candidate applied for the same role, the current Shell employee must be the preferred candidate.

### Plaintiffs' Backgrounds

57.    Before being hired by Shell PLC on September 21, 2009, Mr. Taylor had served as a law enforcement officer and served as a law enforcement mentor in Iraq.

58.    In 2005, Mr. Taylor was sent back from Iraq to serve as the Quick Reaction Force Security Team Lead to assist with emergency disaster relief during Hurricane Katrina, helping save people from the flood.

59.    From there, Mr. Taylor served over four years in Security Services roles in Iraq and Afghanistan, first as a Senior Security Lead/Instructor and then as a Manager in the Afghanistan Police Program's Security Management Cell.

60.    From 2009 forward, Mr. Taylor worked for Shell as a Real Estate Asset Protection Manager responsible for all security aspects for the Shell Woodcreek Site at 150 N. Dairy Ashford, Houston, TX 77079.

61.    During that time, Mr. Taylor was promoted (from a JG5 to a JG4) and continually given more responsibility due to his achievements, high performance, and

awards.

62.     Mr. Taylor was selected for the US Security Advisor role in U.S. CS at Shell USA, Inc., and began that role on November 16, 2021.

63.     During his entire career with Shell, Mr. Taylor received numerous special recognition awards and maintained a high-performance rating with no write-ups or negative feedback.

64.     Mr. Taylor has consistently received "strong" or better performance reviews.

65.     As a Security Advisor for the United States, Mr. Taylor reported to Mr. Hutt (the Country Security Manager), who reported to Mr. Hunt, the RSM.

66.     In approximately 2024, Mr. Hunt, RSM, marked Mr. Taylor's review slightly down from his line manager's assessment after Mr. Taylor filed an internal complaint against Mr. Hunt. Even with this retaliatory reduction, Mr. Taylor retained a "strong" performance rating overall.

67.     Mr. Taylor continually met all deliverables and requirements, and his line manager's review of Mr. Taylor's performance remained "outstanding."

68.     Mr. Taylor's background includes an MSC in Security Management (MSM) University of Houston 2020, BSC in Security Management University of Phoenix 2017, an Associates of Art Degree in Criminal Justice/Law Enforcement Wharton County Junior College 2000. He graduated from the Police Academy

(Licensed Police Officer) at Wharton County Junior College in 1998.

69.    Mr. Taylor's Certifications include:

- Shell Causal Learning Investigator Shell Learning 2024
- Shell Lead Auditor Certified Shell Learning 2023
- Shell High Threat Environment Training AS3 Driving 2023
- Facility Security Officer (MTSA regulated facilities 2022)
- THUET Certified OPITO Accreditation 2022
- Shell Learning to Engage & Deliver (LEAD) Shell Learning 2020
- Shell Agile Project Management Shell Learning 2019
- Discipline Controls & Assurance Framework Shell Learning 2019
- Contract Management Shell Learning 2018
- Incident Command System (100, 200, 300, 400, 700) Shell Learning 2018
- Smith System Defensive Driving
- Certified Executive Protection (EP) ASIS 2014
- Certified Protection Professional (CPP) ASIS 2012
- US Department of State Worldwide High Threat Protection US DOS WPPS 2007.

70.    Ms. Romak served in the United States Air Force for 10 years, including during the Gulf War. In the Air Force, Ms. Romak worked on installing and maintaining security and communications systems.

71.    Ms. Romak also deployed to South Korea for over 1.5 years, serving in an Air Support Operations Squadron. While there, she received specialized 3-day combat training and was certified as a member of the combat training team.

72.    While in the Air Force, Ms. Romak also received an Airman Leadership Training certification.

73.    After leaving the Air Force, Ms. Romak was hired by Shell Energy

Resources (a wholly owned subsidiary of Shell PLC) on May 19, 2008.

74.    Ms. Romak worked at Shell Pipeline as an HSSE System Advisor, serving as the Security Focal Point for all the Midstream assets in the U.S.

75.    In this role, she developed the first MTSA-regulated Security Plan, which became the standard protocol in Security.

76.    On August 1, 2022, Ms. Romak was transferred to Shell USA to serve as a Security Advisor in U.S. CS.

77.    In the Security Advisor role for the United States, Ms. Romak reported to Mr. Hutt (the CSM), who reported to the RSM, Mr. Hunt.

78.    Prior to joining the Corporate Security team, Ms. Romak's Certifications included:

- Shell Auditing HSSE & SP Control Framework (5-day course)
- Shell Causal Learning Investigator (5-day course)
- Shell Incident Management – Incident Command System 100, 200 and 300
- Smith System Defensive Driving
- Shell Contract Holder Training
- Shell Management of Change – Awareness, Knowledge and Skill
- Shell Sphera Cloud Event Owner Training
- Shell Basics of Financial Management (3-day course)
- Shell Emergency Plans and Procedures
- Shell Assist & Assure Leaders
- Shell Coaching Model and Supporting Tools
- Shell Contractor HSSE & SP Management Assessment
- Shell Contractor Safety Management System

79.    Shell has continued to invest in Ms. Romak as a Security Advisor at U.S. CS, where she had obtained the following Certifications and Trainings:

- Security Risk Assessment Methodology
- Facility Security Officer (MTSA Regulated Facilities)
- Water Survival / Helicopter Underwater Egress (HUET)
- Texas DHS Infrastructure Liaison Course Certification
- Hostile Environment Awareness Training with Advanced Counter-Ambush Driving Certification
- Kidnap and Ransom Awareness Training
- FBI Active Shooter Training

80.    During her 17-year career with Shell, Ms. Romak performed exceptionally well. She was hired on as a full-time employee after initially serving as a contractor, she was then promoted 3 times, including a double promotion, and was continually given more responsibility due to her achievements and high performance. Ms. Romak received 11 special recognition awards and maintained a high-performance rating with no write-ups or negative feedback during her time with Shell.

81.    Ms. Romak has consistently received "strong" or better performance reviews.

- 2024: Strong – job grade 4 (Line Manager and Mr. Hunt evaluated as "Higher," but Mr. Manning (UK) reduced to "Strong")
- 2023: Strong – job grade 4 (Line Manager evaluated as "Higher," but Mr. Manning (UK) reduced to "Strong")
- 2022: Strong – promoted to job grade 4

**MR. HUNT'S DISCRIMINATORY REORGANIZATION**

82.    In October 2024, Mr. Hunt began planning a reorganization of the U.S. CS Team.

83.    On January 1, 2025, Mr. Hunt, the RSM, brought Ms. Chevez over from the Trading & Supply organization (another team inside Shell USA). Mr. Hunt

14

created a new Security Advisor role within the US Corporate Security Team for Ms. Chevez, which raised costs and increased the budgetary needs for U.S. CS.

84.    Ms. Chevez had begun working with Shell, USA Inc. in approximately August 1997 through May of 2011 as a Shell Administrative Assistant (basic admin duties), upon information and belief, most likely in a starting pay grade.

85.    From May 2011 through September 2021, she was promoted to Security Assurance Analyst, where her duties included administrative tasks, such as uploading security risk assessments to SharePoint, booking meetings, and sending reminders. During this time, she had no physical security duties, nor was she trained on them at even a basic level. Upon information and belief, from May 2011 through September 2021, she was at a lower pay grade, Pay Grade 6.

86.    From October 2021 through January 1, 2025, Ms. Chevez worked as a Security Advisor for Trading and Supply within Shell USA, Inc. She was only responsible for this one business unit's assets, which were almost all terminals.

87.    While Ms. Chevez worked at Trading and Supply, Mr. Taylor trained Ms. Chevez on security risk assessments and security plans. Before his training, Ms. Chevez did not know how to do a security risk assessment. She had no executive protection experience or event protection experience of any kind.

88.    On or about January 1, 2025, Mr. Hunt hired Ms. Chevez without notifying Mr. Hutt, the line manager for the new role and the U.S. Country Security Manager for Corporate Security at Shell, USA, Inc., violating Shell protocols.

89.    On January 9, 2025, after onboarding Ms. Chevez, Mr. Hunt announced in an email that a reorganization was occurring.

90.    Ms. Chevez, a Hispanic female, came from a role in Trading & Security (TS), a different business line, which required different skills that did not directly map into the new role.

91.    Upon information and belief, when Ms. Chevez first joined U.S.CS on January 1, 2025, she was not asked to do a Written Assessment to join or apply for the position.

92.    A discussion was never held with the U.S. CS Team about possibly relocating for the new roles. Nor was Human Resources made available to Plaintiffs or others in US CS to respond to any questions about possible relocations.

93.    The job postings indicated, "Grading decisions will also depend on other factors," without providing any indication of what those might be.

94.    In the call on January 9, Mr. Hunt, the RSM, told Plaintiffs that a "Written Assessment" would be used to screen applicants.

95.    Upon information and belief, the RSM previously attempted to use a Written Assessment, but U.S. HR prevented the use of written assessments because they violated Shell policy.

96.    Mr. Hunt had previously, in or about 2021 or 2022, replaced a Regional Security Advisor (JG2), previously held by a White American Male based in Houston, with Mr. Colombo, a Latin American Male from Argentina.

16

97.    Before this reorganization, Mr. Hunt also had replaced the U.S. Intel Analyst, a role previously held by a White American Male, with Ms. De los Rios, an Intel Analyst based in Mexico and a non-US Citizen.

98.    On or about January 8, 2025, Mr. Taylor and Ms. Romak noticed that Mr. Hunt repeatedly gave preferential treatment to employees of color and non-Americans over White American employees.

99.    For example, Mr. Hunt directed Mr. Colombo, the Regional Security Advisor, to coach and prepare Ms. Chevez for the interview process.

- The first coaching session began on January 15th at 3 pm-4 pm.
- The second coaching session was on January 22nd at 2-3 pm.
- The third coaching session was on January 29th from 2 pm to 3 pm.
- The fourth coaching session was January 30th at 10 am-11 am
- Fifth coaching session was February 6th at 11-11:30 am (Also day of 1st Initial Interview)
- Sixth coaching session scheduled for February 12th at 2 pm-3 pm.
- Seventh coaching session scheduled for February 19th at 2-3 pm.
- Eight coaching sessions are scheduled for February 20th at 10 am-11 am.
- Ninth coaching session scheduled for February 26th at 2 pm-3 pm.

100.    Neither Mr. Hunt, nor anyone else, offered Mr. Taylor or Ms. Romak equivalent coaching opportunities.

101.    On January 23, 2025, Mr. Hunt told Mr. Taylor that he had to resubmit for his current role because "others had expressed interest in the role," and Shell **"was looking to diversify the talent."**

102.    Only the remaining White employees on the team, including Ms. Romak

17

and Mr. Taylor, were required to reapply for their current roles and to select backup roles in other regions.

103.    Ms. Chevez was instructed to apply only for the Houston-based Security Advisor South role.

104.    The other employees (all persons of color already in U.S.CS), were not required to reapply for their current roles or to select backups in the RSM's reorganization, including Ms. Chevez, Mr. Erazo, Ms. Olivarez, Mr. Colombo, and Ms. De los Rios.

105.    Before Mr. Hunt made his determinations on the reorganization, on January 23, 2025, Ms. Romak submitted an internal complaint alleging policy violations in the reorganization process, alleging that Mr. Hunt had engaged in an "EEOC violation," describing the process as "seem[ing] biased."

106.    When this complaint was investigated, Mr. Taylor alleged that the RSM (Mr. Hunt) was racially discriminating under the guise of the reorganization.

107.    On February 4, 2025, Mr. Taylor was sent a Teams message from Ms. Olivarez that stated, "Just a heads up, Wayne would like a DE&I presentation (20 Minutes) for our regional call."

108.    On February 11, 2025, Ms. Chevez was allowed to take her written assessment from home, while Ms. Romak and Mr. Taylor were both required to take their assessments in the office.

109.    While Ms. Chevez could take her written assessment without intrusion

or interruption, Mr. Hunt interrupted on two occasions and glared at the computer screens of Ms. Romak and Mr. Taylor during their one-hour in-office written assessments, attempting to intimidate them and undermine their performance.

110.    Despite doing well on the written assessments in this difficult situation, both were denied the Houston-based Security Advisor South role, which was given to Ms. Chevez.

111.    The RSM determined that the Line Manager, Hutt (White), whose title was Country Security Manager, was to be replaced by a Black male, Mr. Jackson. Mr. Jackson came from a Lagos, Nigeria, expatriate assignment in Business Integrity and lacked substantial experience in the security of persons and assets.

112.    In Mr. Jackson's role in Lagos, he primarily investigated complaints of fraud, rather than focusing on the protection of physical assets and company executives.

113.    Mr. Hutt, a Shell employee for nearly fifteen (15) years who held the Country Security Manager role for eight (8) years, should have been listed as a preferred candidate. He was not and was instead discharged on June 1, 2025.

114.    Others in the Corporate Security group, but of a different racial or ethnic group, were not even required to resubmit for their positions in the alleged "reorganization," but all three White employees were required to do so.

115.    On February 18, 2025 Mr. Hunt conducted Ms. Romak's interview for the reorganization after work hours.

116.   On March 3, 2025, Ms. Romak received a letter stating she was not selected to continue in her role.

117.   Also on March 3, 2025, Ms. Romak received notification that her internal complaint had been denied.

118.   On the same day, Mr. Taylor also received a notification that his internal complaint had been denied.

119.   In the "reorganization," Mr. Hunt created new location-based positions for U.S.CS, including a regional "Security Advisor South" position based in Houston, a regional "Security Advisor East" position based in Pennsylvania, and a regional "Security Advisor West" position based in California. He also promoted Ms. Velazquez to the Country Security Manager for Mexico.

120.   Until this "reorganization," U.S. CS's central headquarters were in Houston, and all employee U.S. Security Advisors were based there.

121.   Mr. Taylor applied for "Security Advisor South," the Houston-based role, as his first choice, "Security Advisor West" as his second-choice job, and "Security Advisor East" as his third-choice job.

122.   Mr. Hunt chose Ms. Chevez, a Hispanic female who does not have Mr. Taylor's certifications or qualifications, to fill the Security Advisor South role, which was most equivalent to Mr. Taylor's Houston pre-reorganization role.

123.   Indeed, since this decision was made, Mr. Taylor has repeatedly been asked to perform duties belonging to Ms. Chevez (like guarding the CEO when he

was in the region) because it was well known that she was not competent to fulfill those duties.

124.    Likewise, Mr. Taylor was passed over for the Security Advisor West role in favor of Ms. Velazquez, another less qualified Hispanic female.

125.    Ms. Velazquez, a Hispanic female, was announced as the 'Security Advisor West' on March 17, 2025.

126.    Ms. Velazquez was not eligible to serve in this role, as she is not a U.S. citizen and failed to meet even that most basic qualification.

127.    Mr. Hunt, ultimately realizing this, on March 20, 2025, three days after naming her Security Advisor West, announced that Ms. Velazquez would instead become Mexico's Country Security Manager.

128.    Upon information and belief, when Ms. Velazquez was appointed to the Mexico Country Security Manager role, she was not asked to do a Written Assessment to join or apply for the position.

129.    On March 20, 2025, Mr. Hunt emailed the Corporate Security team to announce the new positions: Ms. Chevez for South Security Advisor, Mr. Erazo for West Security Advisor, Mr. Taylor for East Security Advisor, and Ms. Velazquez for Country Security Manager (CSM) for Mexico.

130.    On March 26, Mr. Manning announced the three new Security Advisor Roles, and Ms. Romak's and Mr. Hutt's departures to the entire organization.

131.    Had Mr. Taylor been given the Security Advisor West position, Ms.

Romak would have been placed in the Security Advisor East position and not terminated.

132.    Mr. Hunt instead announced that Mr. Erazo (a Hispanic male contractor and non-Shell employee) would serve as the Security Advisor West.

133.    In so doing, Mr. Hunt declined to apply "the employee preference," which would have required him to select current Shell employees over contractors or external hires.

134.    Mr. Hutt (Mr. Taylor and Ms. Romak's former supervisor) stated that both were more qualified than Erazo and had demonstrated superior performance.

135.    Mr. Hunt also selected Erazo despite the fact that in December of 2024, Mr. Hutt, then Country Security Manager, was preparing to terminate Mr. Erazo's contract for lack of performance.

136.    However, despite this documented history of poor performance and despite his status as a mere contractor, Mr. Hunt placed Mr. Erazo in a job Mr. Taylor applied for, and for which Mr. Taylor was eminently more qualified.

137.    Since taking on his role on August 19, 2025, Erazo has asked for Mr. Taylor's assistance at U.S. CS, explaining that he has never done a Security Assessment or Security Plan for Executive Protection and has never even seen one.

138.    Mr. Hunt's hiring of Erazo over existing Shell employees violated clear Shell policy that allowed Mr. Hunt to hire an outside applicant only if no qualified Shell employees applied for the position.

139.   This left Mr. Taylor in his third-choice role of Security Advisor East.

140.   Ms. Romak had listed "Security Advisor East" as her second-choice job in the reorganization. Mr. Taylor is senior to Ms. Romak, and he therefore got the Security Advisor East role.

141.   Because the Defendants made employment decisions based on race, color, and national origin, Ms. Romak was not selected for any roles and Shell discharged her on June 1, 2025.

142.   On February 7, 2025, Mr. Hunt defended his disregard of the employee and incumbent preferences by stating that there were high levels of interest in the positions.

143.   Shell policy does not authorize the elimination of the incumbent and employee preferences due to high interest in the position.

144.   The reorganization's outcome resulted in Ms. Chevez, a Hispanic, being selected for the South Security Advisor role.

145.   Ms. Velazquez, a Mexican national based in Mexico (Hispanic), was chosen for the West Security Advisor role but is now Country Security Manager in Mexico for Shell Mexico.

146.   A Hispanic contractor, Mr. Erazo, is in the Security Advisory West role.

147.   Mr. Jackson (Black) has replaced Mr. Hutt (White) as Shell US's country security manager.

**CLAIMS FOR RELIEF**

<u>**COUNT I**</u>
**Violation of the Civil Rights Act of 1866, 42 U.S.C. §1981**
***(Both Plaintiffs)***

148.    Plaintiffs repeat and reassert each and every allegation in paragraphs above as if fully set forth herein at length.

149.    42 U.S.C. § 1981 prohibits racial discrimination in employment.

150.    Defendants conspired and agreed to eliminate and deny employment positions to Mr. Taylor and Ms. Romak based on race, color, ethnicity, or national origin.

151.    Mr. Taylor was the most qualified to remain in Houston as Security Advisor South but was denied that opportunity due to his race and national origin. He was more qualified than Ms. Velasquez or Mr. Erazo for the Security Advisor West position based in California, but was denied that opportunity due to his race, color, ethnicity and/or national origin.

152.    Defendants, jointly and severally, knowingly and intentionally violated Section 1981 by demoting Mr. Taylor to Security Advisor East and forcing him to move from Houston, Texas, to Montgomery County, Pennsylvania, because of his race, color, ethnicity and/or national origin.

153.    Defendants, jointly and severally, knowingly and intentionally violated Section 1981 by wrongfully denying Ms. Romak a position as Security Advisor East, due to her race, color, ethnicity and/or national origin.

154.    Defendants, jointly and severally, knowingly and intentionally violated

Section 1981 by wrongfully discharging Ms. Romak as a Security Advisor in Houston, Texas, and terminating her from Shell, USA, Inc., because of her race, color, ethnicity and/or national origin.

155.    Defendants have acted with malice and/or reckless indifference to Mr. Taylor's and Ms. Romak's rights and thus have caused them to be damaged.

### COUNT II
**Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e *et seq.***
*Race, Ethnicity, National Origin, and Color as Motivating Factors in*
*Employment Practices*
*Plaintiff Taylor*

156.    Plaintiffs repeat and reassert each and every allegation in paragraphs above as if fully set forth herein at length.

157.    Mr. Taylor is a White male.

158.    Mr. Taylor was better qualified for the positions for which he applied.

159.    Despite being qualified for his first—and second-choice positions, the Defendants, jointly and severally, including through Mr. Hunt's intentional actions, selected lesser-qualified and even unqualified people of color, including Ms. Chevez, Ms. Velazquez, and Mr. Erazo, over Mr. Taylor because of his race, color, ethnicity and/or national origin..

160.    Further, a pattern and practice of discrimination occurred in

Defendants' January 2025 reorganization, which resulted in the involuntary transfer of Mr. Taylor to a less desirable role.

161.   Mr. Hunt further expressly admitted that he was seeking to "diversify the talent…," which, together with Shell's policies on DEI stated above, shows that the Defendants jointly intentionally sought to promote people of color over White people.

162.   As a result of this discrimination, Mr. Taylor is being transferred and demoted, while they denied Mr. Taylor a promotion to which he was entitled.

163.   It required him to relocate to Pennsylvania and did not promote him, whereas the Defendants promoted Ms. Velazquez and are paying Mr. Erazo a higher rate under his contract.

164.   It further increases Mr. Taylor's personal costs to live and work in Pennsylvania compared to the Houston, Texas, area.

165.   Mr. Hunt approved this relocation to Pennsylvania on July 10, 2025, on an "expedited" basis, mere hours after Mr. Taylor told Mr. Hunt that his mother had died and requested bereavement leave.

166.   Mr. Taylor's required transfer to Pennsylvania constitutes harm inflicted on Mr. Taylor. *See Muldrow v. St. Louis*, 601 U.S. 346, 355 (2024) ("Many forced transfers leave workers worse off respecting employment terms or conditions. After all, a transfer is not usually forced when it leaves the employee better off.") (cleaned up).

167.   Mr. Taylor has complied with Title VII's charge filing provisions, 42 U.S.C. §§ 2000e-5(e)(1) and (f)(1).

168.   Mr. Taylor filed a timely charge of discrimination against Shell with the Equal Employment Opportunity Commission.

169.   Mr. Taylor received a Determination and Notice of Rights letter from the United States Equal Employment Opportunity Commission.

170.   Defendants were motivated by their desire to replace White employees in the U.S. CS with persons of color, and discriminated against Mr. Taylor concerning his compensation, terms, conditions, or privileges of employment because of his race, color, ethnicity and/or national origin.

171.   The Supreme Court and the Fifth Circuit clearly state, "evaluating a person by ancestry instead of by his or her own merit reinforces pernicious stereotypes and demeans the dignity and worth of the individual." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 US 181, 220 (U.S. 2023); *Price v. Valvoline, L.L.C.*, 88 F. 4th 1062, 1068 (5th Cir. 2023).

172.   Further, "Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 801 (U.S. 1973).

173.   The Supreme Court on June 5, 2025 explained that,

"we rejected that argument, holding that "Title VII prohibit[ed] racial discrimination against the white petitioners in th[at] case upon the same standards as would be applicable were they Negroes." *Id.*, at 280, 96 S.Ct. 2574 (emphasis added); see also id., at 279, 96 S.Ct. 2574 (citing favorably the Equal Employment Opportunity Commission's view that Title VII bars discrimination

"against whites on the same terms as racial discrimination against nonwhites"). *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310, 145 S. Ct. 1540, 1546, 221 L. Ed. 2d 929 (2025) (citing *McDonald v. Santa Fe Trail Transportation Co.,* 427 U. S. 273 (1976)) (emphasis added).

174.    Shell's actions as described herein constitute race-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, including 42 U.S.C. § 2000(e)-2(a), and have caused Mr. Taylor to be damaged, including loss of past income, benefits, and future income.

## COUNT III
### Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e *et seq.*
### *Race, Ethnicity, National Origin, and Color as Motivating Factors in Employment Practices*
### *Plaintiff Romak*

175.    Plaintiff repeats and reasserts each allegation in the paragraphs above as if fully set forth herein.

176.    Ms. Romak is a White female.

177.    Ms. Romak was better qualified for the positions for which she applied, having served in the United States Air Force, and having many certifications specific to the role. Ms. Chevez lacked these key certifications at the time of her hire into Corporate Security and had no experience in Executive Protection or Event Protection.

178.    Ms. Romak, despite facing materially worse circumstances, did

excellently on her Written Assessment.

179.   Despite being significantly more qualified for the positions, Ms. Romak was removed from her prior position and not selected for any of the positions for which she applied. This resulted in her termination from Shell.

180.   Defendants, jointly, prioritized the hiring of people of color and ethnic minorities over White employees, constituting both evidence of intentional discrimination, and showing a Pattern and Practice of discrimination based on her race, color, ethnicity and/or national origin..

181.   On January 23, 2025, Mr. Hunt told Mr. Taylor he sought to "*diversify the team.*"

182.   Shell offered no training to corporate security employees including Mr. Hutt, Mr. Taylor, and Ms. Romak to explain civil rights laws in the United States compared to those in the U.K.

183.   Shell leadership, including Mr. Manning, as shown in Shell's Annual Report (2024), promotes race as a motivating factor in employment practices.

184.   On March 20, 2025, Mr. Hunt emailed the Corporate Security team to announce the new positions: Ms. Chevez for South Security Advisor, Mr. Erazo for West Security Advisor, Mr. Taylor for East Security Advisor, and Ms. Velazquez for Country Security Manager (CSM) for Mexico.

185.   On March 26, 2025, Mr. Manning announced the three new Security Advisor Roles and Ms. Romak's and Mr. Hutt's departures to the entire organization.

186.    Defendants denied Ms. Romak any position, giving her notice of Discharge or Termination on the same day that Human Resources denied her early January 2025 internal complaint, which cited to the EEOC and bias, reflecting retaliation in violation of Title VII, (described in the next count), in addition to her discrimination claims.

187.    Mr. Hunt gave her a Tear Jar as a gift before her departure.

188.    A tear jar is a vessel designed to hold the tears of its owner, and the "gift" was intended to mock and belittle Ms. Romak, who had just been fired due to her race. The "gift" was clearly designed to add insult to the already inflicted injury.

189.    Ms. Romak filed a timely charge of discrimination and retaliation against Shell with the Equal Employment Opportunity Commission, complying with Title VII's charge filing provisions, 42 U.S.C. §§ 2000e-5(e)(1) and (f)(1).

190.    Ms. Romak received a Determination and Notice of Rights letter from the United States Equal Employment Opportunity Commission (a right to sue letter) *[See Exhibit 1]* and *(tolling agreement respectively)* *[See Exhibit 2]*.

191.    Shell, motivated by its desire to replace White employees in the USCS Team with "diverse" employees, discriminated against Ms. Romak concerning her compensation, terms, conditions, or privileges of employment because of her her race, color, ethnicity and/or national origin.

**COUNT IV**
**Retaliation**
**Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e-3**

### *Plaintiff Romak*

192.   Plaintiffs repeat and reassert each allegation in the paragraphs above as if fully set forth herein.

193.   On January 23, 2025, Ms. Romak submitted an internal complaint alleging policy violations in the reorganization process and alleging that Mr. Hunt had engaged in racial discrimination.

194.   That complaint alleged that the reorganization was a potential EEOC violation and exhibited bias.

195.   This constitutes a protected activity under 42 U.S.C. § 2000e-3 because Ms. Romak thereby "opposed a[] practice made an unlawful employment practice by this subchapter."

196.   On March 3, 2025, Ms. Romak was notified that she would not receive any role in the reorganization, and on March 20 she was notified that she would be terminated effective June 1, 2025.

197.   On the same day, March 3, 2025, Ms. Romak was also personally notified that her internal complaint had been denied.

198.   Defendants retaliated against Ms. Romak because she reported Mr. Hunt's unlawful discriminatory practices, thereby adversely affecting her employment.

199.   Accordingly, through the RSM's actions, Shell engaged in retaliatory behavior violating 42 U.S.C. § 2000e-3.

31

200. Ms. Romak filed a timely charge of discrimination and retaliation against Shell with the Equal Employment Opportunity Commission, complying with Title VII's charge filing provisions, 42 U.S.C. §§ 2000e-5(e)(1) and (f)(1).

201. Ms. Romak received a Determination and Notice of Rights letter from the United States Equal Employment Opportunity Commission.

**COUNT V**
**Retaliation**
**Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e-3**
*Plaintiff Taylor*

202. Plaintiffs repeat and reassert each allegation in the paragraphs above as if fully set forth herein.

203. When interviewed by Shell investigators pursuant to Ms. Romak's January 23, 2025, complaint, Mr. Taylor alleged that Mr. Hunt was engaged in race-based discrimination in favor of Hispanic employees and against White employees, including both Ms. Romak and Mr. Taylor.

204. This constitutes a protected activity under 42 U.S.C. § 2000e-3 because Ms. Romak "opposed a[] practice made an unlawful employment practice by this subchapter."

205. After Mr. Taylor cooperated with the investigation of Ms. Romak's complaint against Mr. Hunt for racial discrimination, he was passed over for his preferred job and thereby harmed.

206. Mr. Hunt also retaliated against Mr. Taylor because he had reported Mr. Hunt's unlawful discriminatory practices and had his employment adversely affected.

207. Accordingly, through Mr. Hunt's actions, Shell engaged in retaliatory behavior violating 42 U.S.C. § 2000e-3.

208. Mr. Taylor filed a timely charge of discrimination and retaliation against Shell with the Equal Employment Opportunity Commission, complying with Title VII's charge filing provisions, 42 U.S.C. §§ 2000e-5(e)(1) and (f)(1).

209. Mr. Taylor received a Determination and Notice of Rights letter from the United States Equal Employment Opportunity Commission (a right to sue letter) *[See Exhibit 1]* and *(tolling agreement respectively) [See Exhibit 2].*

<u>COUNT VI</u>
**Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA), and Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).**
*Plaintiff Romak*

210. Ms. Romak repeats and reasserts each allegation in the paragraphs above as if fully set forth herein.

211. Defendant Shell USA, Inc., is a federal contractor subject to the requirements of VEVRAA.

212. Upon information and belief, Shell has entered and is actively working under one or more contracts with the federal government exceeding $100,000, thereby triggering VEVRAA's requirement that federal contractors engage in

affirmative action and nondiscrimination in the employment of covered veterans.

213.   As a federal contractor subject to VEVRAA, Shell is legally obligated to engage in affirmative recruitment, retention, promotion, and nondiscrimination practices toward qualified veterans such as Ms. Romak. This includes the obligation to maintain a written affirmative action plan for veterans, regularly track veteran employment and application data, provide transparency in selection and promotion criteria, and ensure that veterans are not disadvantaged in employment decisions.

214.   Ms. Romak is a veteran of the United States Air Force, having served honorably in active-duty military service during the Gulf War.

215.   Ms. Romak is therefore a "covered veteran" under VEVRAA.

216.   Accordingly, at all relevant times, she was a member of a class protected by the Vietnam Era Veterans' Readjustment Assistance Act of 1974 ("VEVRAA"), 38 U.S.C. § 4212, as amended. *Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA), Pub. L., No. 93–508, 88 Stat. 1578 (1974)*.

217.   Under VEVRAA any contract in the amount of $100,000 or more entered into by any department or agency of the United States for the procurement of personal property and nonpersonal services (including construction) for the United States, shall contain a provision requiring that the party contracting with the United States take affirmative action to employ and advance in employment qualified covered veterans. This section applies to any subcontract in the amount of $100,000 or more entered into by a prime contractor in carrying out any such contract.

34

218.    Defendants therefore violated Section 402 of the Vietnam Era Veterans'
Readjustment Assistance Act (VEVRAA), Pub. L., No. 93–508, 88 Stat. 1578 (1974)
and Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) by failing to give Ms.
Romak her statutory rights and protections during the reorganization process.

219.    Further, 8 U.S. Code § 4212 mandates that if any veteran covered by
the first sentence of subsection (a) believes any contractor of the United States has
failed to comply or refuses to comply with the provisions of the contractor's contract
relating to the employment of veterans, the veteran may file a complaint with the
Secretary of Labor, who shall promptly investigate such complaint and take
appropriate action in accordance with the terms of the contract and applicable laws
and regulations.

220.    Ms. Romak was employed by Shell for 17 years and had held the position
of Security Advisor U.S. within the Corporate Security Division since August 1, 2022.
She was uniquely credentialed, having extensive experience in field operations, site
security, and offshore deployment protocols. She was also Shell's only female military
veteran in the Corporate Security Division at the time of the 2025 reorganization.

221.    During her employment with Shell, Ms. Romak was fully qualified for
her position and consistently met or exceeded performance expectations. She served
as a Security Advisor U.S. and maintained performance required, credentials,
certifications, and field experience.

222.    Ms. Romak's military background contributed directly to her

professional success at Shell. In fact, her evaluations reflected consistent competency and commitment. No prior disciplinary action or performance deficiency was ever documented

223.    In early 2025, Shell initiated a purported *"reorganization"* of its U.S. Corporate Security team. As part of this reorganization, Shell selectively forced certain employees including Ms. Romak and other White American employees to reapply for their own positions, while exempting others, primarily non-White, non-veteran individuals, from this requirement.

224.    However, despite her superior qualifications, experience, and tenure, Ms. Romak was involuntarily removed from her position, and Shell subsequently filled her role with an individual who was neither a veteran nor comparably qualified under Shell's own standards.

225.    Also, Ms. Romak was required to *reinterview* for her own position. The selection process lacked transparency, abandoning its internal preference policies, including both *"incumbent preference"* and *"employee preference,"* which previously guaranteed a legitimate opportunity for retention. The reorganization also failed to provide the "veteran's preference" required by VEVRAA.

226.    Despite being fully qualified and tenured, Ms. Romak was stripped of her role and compelled to reinterview alongside candidates with significantly *less experience*.

227.    The outcome of this process was preordained, and Ms. Romak was

36

removed from her role and ultimately eliminated from Shell's U.S. security operation.

228. In effect, her position or its *substantial equivalent* was reassigned to a non-veteran, who lacked comparable experience and who had not been required to compete under the same process. That individual had been "*coached"* into technical eligibility and was internally advanced without documentation of performance superiority.

229. Shell provided no written explanation for Ms. Romak's removal. She received no comparative data and no ranking.

230. Additionally, at no point was her military status acknowledged, factored, or afforded protection. Also, at no point was she notified of her rights as a veteran, either under internal policy or federal law.

231. Ms. Romak filed an internal EEO complaint, raising concerns about the discriminatory application of the reorganization. Less than forty days later, she was officially informed that she would not be reassigned, offered an alternative placement, or retained in any capacity. That termination followed directly on the heels of protected activity.

232. Shell's treatment of Plaintiff, Ms. Romak was not only unlawful under Title VII and Section 1981, but also constituted a violation of VEVRAA, in that Shell willfully failed: (1) to apply its selection criteria in a nondiscriminatory and consistent manner; (2) to give preference to a qualified protected veteran, as required under VEVRAA regulations; (3) to properly notify Ms. Romak of her rights as a

veteran under federal contractor obligations; (4) retaliated against Ms. Romak for engaging in protected activity concerning discriminatory employment practices.

233.  Shell's conduct constitutes a knowing and willful violation of federal law. Its removal of Ms. Romak from employment, without consideration of her qualifications, tenure, or military service, and under a selectively applied and pretextual restructuring, and is actionable under VEVRAA.

234.  As such and as a direct and proximate result of Defendant's conduct, Ms. Romak has suffered substantial damages, including lost income, lost benefits, loss of career progression, emotional distress, reputational harm, and related consequential losses.

235.  Furthermore, Shell's actions were willful, knowing, and undertaken with disregard for its obligations under federal law with respect to veteran employees and Shell's failure to comply with VEVRAA's affirmative action and nondiscrimination mandates constitutes a per se violation of 38 U.S.C. § 4212(b) and 41 C.F.R. §§ 60-300.45 through 60-300.66.

236.  Thus, upon information and belief, Shell failed to comply with each of the above-listed requirements. It failed to maintain or apply any veteran-specific retention protocols. It failed to document or consider Ms. Romak's veteran status in its restructuring process. And it failed to follow any affirmative action plan in effect during the events in question.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Kevin Taylor and Ms. Michelle Romak respectfully request that this Court enter judgment in their favor and against Defendant Shell, USA, Inc. and Defendant Wayne Hunt, and provide the following relief:

A.    A declaratory judgment that Shell violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq. with respect to both Plaintiffs.

B.    A declaratory judgment that Shell violated VEVRAA with respect to Ms. Romak.

C.    A declaratory judgment that Shell violated the Civil Rights Act of 1866, 42 U.S.C. §1981 with respect to both Plaintiffs.

D.    An order for such relief, including back pay and front pay, and benefits, which will make Plaintiffs Kevin Taylor and Michelle Romak whole for Shell's conduct; compensatory damages; punitive damages; and prejudgment and post-judgment interest.

E.    Reasonable costs and expenses of this action, including attorneys' fees, under Title VII of the Civil Rights Act of 1964, and any other applicable laws.

F.    Such other relief as the Court deems appropriate and just.

DATED this ___th day of August, 2025.

*/s/ Sean C. Timmons*

Sean C. Timmons, Esq., LL.M.
Managing Partner, Tully Rinckey PLLC
Texas Bar No.: 24067908
New York State Bar No.: 5470190
Admitted to Practice
in all Texas Federal Courts
18722 University Blvd., Ste. 235

39

Sugar Land, TX 77479
(832) 240-3273 Phone
(832) 241-5998 FAX
Stimmons@tullylegal.com
*Attorney for Plaintiff(s)*

And

Julia Z. Haller*, DC Bar No. 466921
Jacob P. Meckler,* DC Bar No. 90005210
America First Legal Foundation
611 Pennsylvania Ave. SE #231
Washington, D.C. 20003
Juli.Haller@aflegal.org
Jacob.Meckler@aflegal.org
*Pro Hac Vice application forthcoming**