## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| KEVIN TAYLOR,<br><br>and<br><br>MICHELLE ROMAK<br><br>      Plaintiffs,<br><br>vs.<br><br>SHELL PLC,<br><br>and<br><br>SHELL USA Inc.,<br><br>and<br><br>WAYNE HUNT<br><br>      Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Case No. 4:25-cv-04042<br><br>JURY DEMANDED |

Plaintiffs Kevin Taylor and Michelle Romak, by and through their undersigned counsel, hereby file their First Amended Complaint and allege and state as follows:

### INTRODUCTION

1.      Mr. Taylor is an experienced corporate security professional who has worked for Shell USA for 16 years. He has been employed by Shell USA, Inc., in the Corporate Security Division (U.S.CS), based in Houston, Texas, since November 16,

1

2021. Mr. Taylor is an American Citizen and a White male.

2.      Ms. Romak is an experienced corporate security professional who has worked for Shell Energy Resources, Shell Exploration & Production, Shell Pipeline, and Shell USA, Inc. for the last 17 years. She has been employed in the Corporate Security Division (U.S.CS), based in Houston, Texas, since August 1, 2022. Ms. Romak is an American citizen, a White female, and a Military Veteran who served during a time of war.

3.      Mr. Hutt has been a Shell employee for nearly fifteen (15) years and has held the position of Country Security Manager for Shell USA, Inc., based in Houston, for over eight (8) years. He is an American Citizen, a White male, and a Military Veteran who served during the Cold War.

4.      On January 9, 2025, Mr. Hunt, Regional Security Manager (RSM) for Corporate Security Americas, announced a pretextual departmental reorganization, which was racially discriminatory.

5.      This reorganization eliminated the three White employees from the Corporate Security Division (U.S.CS) at Shell, USA, Inc. in Houston, Texas, and replaced each with a person of color with less experience and objectively weaker qualifications.

6.      Further, the people of color already working in Corporate Security during this reorganization were not subject to the same requirements and processes as the three White employees.

2

7.    Every replacement was less qualified than the White employee he or she replaced.

8.    Despite their strong and better performance reviews, Romak and Taylor had to reapply for their positions and identify backup roles, despite having numerous certifications and qualifications that other applicants lacked.

9.    Instead of selecting the more qualified Mr. Taylor or Ms. Romak, Ms. Chevez, a Hispanic female with a background as an administrative assistant, was given the Houston-based Security Advisor South role.

10.    Ms. Velazquez, a Hispanic female, was initially assigned the Security Advisor West role, which Mr. Taylor had applied for. However, Ms. Velazquez was ultimately found unqualified for this U.S.-based role and had to be replaced because she was a foreign national lacking U.S. citizenship.

11.    Mr. Hunt then promoted Ms. Velazquez to the Country Security Manager for Mexico.

12.    Thereafter, instead of selecting the most qualified for the Security Advisor West role (Mr. Taylor, who was already passed over for the Houston-based role), Mr. Hunt awarded the position to Mr. Erazo, a Hispanic male, even though Mr. Erazo was a contractor, not a Shell employee.

13.    Mr. Erazo's contract had been in the process of being terminated in December of 2024 due to his poor performance.

14.    Mr. Jackson, an African American male with no background in the

protection of persons and assets, or in executive protection, replaced Mr. Hutt as U.S. Country Security Manager.

15.    Mr. Hunt awarded Mr. Taylor a less desirable position as Security Advisor East within Corporate Security in a different region, necessitating his relocation to Pennsylvania or New Jersey, away from Headquarters, to work remotely without a designated office.

16.    Mr. Hunt terminated Ms. Romak as part of this same reorganization (after passing her over for the Houston-based role), and her last day of employment with Corporate Security at Shell USA Inc. was May 31, 2025.

17.    On or about May 19, 2025, anticipating Ms. Romak's departure, Mr. Hunt bought and gifted Ms. Romak a "tear jar."



18.     Mr. Hunt also terminated Mr. Hutt, Mr. Taylor and Ms. Romak's Line Manager, in this reorganization. Mr. Hutt's last day of employment with Corporate Security at Shell USA Inc. was May 31, 2025.

19.     On or about May 19, 2025, anticipating Mr. Hutt's departure, Mr. Hunt also bought and gifted him a "tear jar."

20.     A tear jar is a vessel designed to collect and save the tears of someone experiencing grief, and here, the gift was intended to humiliate and mock two employees who had just lost their jobs in a racially discriminatory reorganization, evidencing willful and wanton conduct.

21.     Mr. Taylor asked bereavement leave on July 10, 2025, due to the death of his mother. An hour or so later, Mr. Hunt sent out his Approval of Mr. Taylor's transfer to Pennsylvania on an "expedited" basis, providing additional evidence of willful and wanton conduct.

22.     Mr. Taylor had been seeking to avoid the transfer to Pennsylvania (which was known by Mr. Hunt), and the prospect of a forced transfer caused him great stress, which was increased by Mr. Hunt's callous actions.

## NAMED PARTIES

23.     Plaintiff Romak is a Texas citizen whose primary residence is in Katy, Texas.

24.     Plaintiff Taylor is a Texas citizen whose primary residence is in Sugar Land, Texas.

25.   Defendant Shell PLC is a multinational energy company with corporate headquarters at Shell Centre, London, SE1 7NA, United Kingdom.

26.   Defendant Shell PLC is incorporated in the United Kingdom and has over 500 employees.

27.   Defendant Shell USA, Inc. (Shell USA) is a domestic corporation incorporated in the state of Delaware, with its United States Corporate Headquarters at 150 North Dairy Ashford Road, TX 77079. Shell USA is a wholly owned United States subsidiary of Shell PLC, based in the United Kingdom.

28.   Defendant Shell USA has over 500 employees.

29.   Defendant Hunt was and continues to serve as the Regional Security Manager (RSM) for Corporate Security at Shell, USA. Mr. Hunt, as the RSM, oversees the Americas staff to ensure the security of Shell's personnel, assets, and operations in the country for Shell, USA.

30.   At all times relevant here, Mr. Hunt was the RSM who oversaw the reorganization in Corporate Security, managed it, and led the panel with respect to the hiring and employment practices at issue, while at all relevant times, reporting to Mr. Manning, Corporate Security Vice President, who managed the Corporate Security Team from the U.K., at Shell PLC.

## JURISDICTION

31.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the federal claims arise under the Constitution and laws of the United

States, including Title VII of the Civil Rights Act of 1965, 42 U.S.C. §§ 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. §1981.

32.    Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1391(b)(1)–(2) because the alleged unlawful employment practice occurred in this judicial district and the employment records relevant to this dispute lie in this judicial district. This district is also where the Defendants maintain their principal office in the United States.

33.    Plaintiffs seek compensatory and punitive damages under 42 U.S.C. §§ 2000e *et seq.*, § 1988 and Civil Rights Act of 1866, 42 U.S.C. §1981.

34.    Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201, 2202 to include remediation.

## SHELL'S DIVERSITY EFFORTS

35.    Shell USA and Shell PLC (collectively the Shell Defendants) maintain a joint website that highlights "some of the things we're doing" to shape the workforce. This includes promotion, hiring, and employment practices motivated by individuals' immutable race and sex characteristics.[1]

36.    The Shell Defendants unabashedly maintain "pillars and aspirations" to hire and promote individuals based on immutable characteristics.

37.    The Shell Defendants have established a "Global Council for Race,"

---

[1] *Global Diversity, Equity and Inclusion*, Shell, (May 28, 2025), https://perma.cc/2SXV-MEM9. See also, Shell.com/who-we-are/diversity-equity-and-inclusion.html#iframe=L2RlaS8= (May 28, 2025), https://perma.cc/2SXV-MEM9.

which seeks to ensure that the race and sex-based makeup of its workforce "better reflects the communities in which [it] works."

38.     The Shell Defendants also admit to maintaining "race and ethnicity action plans."[2]

39.     Further, the Shell Defendants admit and affirm that they knowingly and intentionally use race, color, and sex as motivating factors in their employment practices as documented in the Shell Annual Report and Accounts for 2024.

40.     The Shell Defendants use extensive internal reporting to document progress towards their goals, which include illegal racial quotas.

41.     The Shell Defendants maintain a Council supported by a global Employee Advisory Board with employees from deliberately selected diverse backgrounds that "was set up to ensure our race and ethnicity action plans are shaped by the voices and experiences of colleagues at Shell."

42.     The Shell Defendants stated in their 2024 Annual Report that "through racial and ethnic representation across our workforce, we aim to reflect the communities in which we work."

43.     The Shell Defendants aim to maintain or exceed having at least one Board member from an ethnic minority background, while acknowledging that this may not be achieved in periods of Board change.

---

[2] Shell.com/who-we-are/diversity-equity-and-inclusion/race-and-ethnicity.html (May 28, 2025), https://perma.cc/2YAX-P3MQ (emphasis added).

44.    As of December 31, 2024, the Board for Shell had three members who identify as members of an ethnic minority group and one EC member who identifies as being a member of an ethnic minority group.

45.    As of the end of 2024, 15% of Shell's Senior Management identified as being from an ethnic minority group.

46.    Shell further states, "**Shell aims to achieve 15% ethnic minority group representation in its Senior Management [B] by 2027.**"

47.    The leadership for both Shell, USA, and Shell, PLC is primarily based in the U.K.

48.    As relevant background, Mr. Hunt and Mr. Manning served in the British Military together.

49.    Mr. Hunt, the RSM, reports to Mr. Manning in the U.K.

50.    While the Shell Defendants have required DEI trainings, including for Corporate Security at Headquarters in Houston, the Shell Defendants provided no training or education to Plaintiffs in Corporate Security at Shell USA, Inc., as employees based in the United States, to explain civil rights laws in the United States versus those of the U.K., and how race cannot be used as a motivating factor in employment practices in the United States.

**BACKGROUND**

**SHELL**

51.    According to Shell's policies, a reorganization at Shell USA must go

through Human Resources.

52.    Standard Procedure for the U.S.CS reorganization should have started with offering the new regional positions to existing staff on the Corporate Security Team.

53.    Standard procedures include the application of an "incumbent preference," which requires that Shell employees wishing to remain in their current roles be listed as the preferred candidate for that role.

54.    During a standard reorganization, a current Shell employee must be selected for any role to which at least one Shell employee applied. This is known as the "employee preference." In other words, if a current Shell employee and an outside candidate applied for the same role, the current Shell employee must be the preferred candidate.

**Plaintiff Taylor's Background**

55.    Before being hired by Shell PLC on September 21, 2009, Mr. Taylor served as a law enforcement officer and law enforcement mentor in Iraq.

56.    In 2005, Mr. Taylor was sent back from Iraq to serve as the Quick Reaction Force Security Team Lead, where he assisted with emergency disaster relief during Hurricane Katrina and helped save people from the flood.

57.    From there, Mr. Taylor served for over four years in Security Services roles in Iraq and Afghanistan, first as a Senior Security Lead/Instructor and then as a Manager in the Afghanistan Police Program's Security Management Cell.

58.    From 2009 forward, Mr. Taylor worked for Shell as a Real Estate Asset Protection Manager responsible for all security aspects for the Shell Woodcreek Site at 150 N. Dairy Ashford, Houston, TX 77079.

59.    During that time, Mr. Taylor was promoted (from a JG5 to a JG4) and continually given more responsibility due to his achievements, consistent high performance, and awards.

60.    Mr. Taylor was selected for the US Security Advisor role in U.S.CS at Shell USA, Inc., and began serving in that role on November 16, 2021.

61.    During his career with Shell, Mr. Taylor received numerous special recognition awards and maintained a high performance rating with no write-ups or negative feedback.

62.    Mr. Taylor has consistently received "strong" or better performance reviews.

63.    As a Security Advisor for the United States, Mr. Taylor reported to Mr. Hutt (the Country Security Manager), who reported to Mr. Hunt, the RSM.

64.    In approximately 2024, Mr. Hunt, RSM, marked Mr. Taylor's review slightly down from his line manager's assessment after Mr. Taylor filed an internal complaint against Mr. Hunt. Despite this retaliatory reduction, Mr. Taylor retained a "strong" performance rating overall.

65.    Mr. Taylor continually met all deliverables and requirements, and his line manager's review of Mr. Taylor's performance remained "outstanding."

66.     Mr. Taylor's background includes an MSC in Security Management (MSM) from the University of Houston, 2020, a BSC in Security Management from the University of Phoenix, 2017, and an Associate of Arts Degree in Criminal Justice/Law Enforcement from Wharton County Junior College, 2000. He graduated from the Police Academy (Licensed Police Officer) at Wharton County Junior College in 1998.

67.     Mr. Taylor's Certifications include:

- Shell Causal Learning Investigator Shell Learning 2024
- Shell Lead Auditor Certified Shell Learning 2023
- Shell High Threat Environment Training AS3 Driving 2023
- Facility Security Officer (MTSA-regulated facilities, 2022)
- THUET Certified OPITO Accreditation 2022
- Shell Learning to Engage & Deliver (LEAD) Shell Learning 2020
- Shell Agile Project Management Shell Learning 2019
- Discipline Controls & Assurance Framework Shell Learning 2019
- Contract Management Shell Learning 2018
- Incident Command System (100, 200, 300, 400, 700) Shell Learning 2018
- Smith System Defensive Driving
- Certified Executive Protection (EP) ASIS 2014
- Certified Protection Professional (CPP) ASIS 2012
- US Department of State Worldwide High Threat Protection US DOS WPPS 2007.

**Plaintiff Romak's Background**

68.     Ms. Romak served in the United States Air Force for 10 years, from 1989 to 1999. Her service therefore encompassed a "period of war" as defined by 38 U.S.C. § 101(11), and she was thus a "covered veteran" as defined by 38 U.S.C. § 4212(a)(3).

69.     Shell knew of her status, as she was a member of Shell's MILNET (Military Network), had identified herself as a veteran, had discussed her service with

her supervisors on occasion, and, when applying for her role in Corporate Security in 2022, had submitted a resume showing her dates of active service.

70.    In the Air Force, Ms. Romak worked on installing and maintaining security and communications systems.

71.    Ms. Romak also deployed to South Korea for over one and a half (1.5) years, serving in an Air Support Operations Squadron. While there, she received specialized 3-day combat training and was certified as a member of the combat training team.

72.    While in the Air Force, Ms. Romak also received an Airman Leadership Training certification.

73.    After leaving the Air Force, Ms. Romak was hired by Shell Energy Resources (a wholly owned subsidiary of Shell PLC) on May 19, 2008.

74.    Ms. Romak worked at Shell Pipeline as an HSSE System Advisor, serving as the Security Focal Point for all the Midstream assets in the U.S.

75.    In this role, she developed the first MTSA-regulated Security Plan, which became the standard protocol in Security.

76.    On August 1, 2022, Ms. Romak was transferred to Shell USA to serve as a Security Advisor in U.S.CS.

77.    In the Security Advisor role for the United States, Ms. Romak reported to Mr. Hutt (the CSM), who reported to the RSM, Mr. Hunt.

78.    Prior to joining the Corporate Security team, Ms. Romak's Certifications

included:

- Shell Auditing HSSE & SP Control Framework (5-day course)
- Shell Causal Learning Investigator (5-day course)
- Shell Incident Management – Incident Command System 100, 200 and 300
- Smith System Defensive Driving
- Shell Contract Holder Training
- Shell Management of Change – Awareness, Knowledge and Skill
- Shell Sphera Cloud Event Owner Training
- Shell Basics of Financial Management (3-day course)
- Shell Emergency Plans and Procedures
- Shell Assist & Assure Leaders
- Shell Coaching Model and Supporting Tools
- Shell Contractor HSSE & SP Management Assessment
- Shell Contractor Safety Management System

79.    Shell has continued to invest in Ms. Romak as a Security Advisor at U.S. CS, where she has obtained the following Certifications and Trainings:

- Security Risk Assessment Methodology
- Facility Security Officer (MTSA Regulated Facilities)
- Water Survival / Helicopter Underwater Egress (HUET)
- Texas DHS Infrastructure Liaison Course Certification
- Hostile Environment Awareness Training with Advanced Counter-Ambush Driving Certification
- Kidnap and Ransom Awareness Training
- FBI Active Shooter Training

80.    During her seventeen (17) year career with Shell, Ms. Romak performed exceptionally well. She was hired on as a full-time employee after initially serving as a contractor. She was then promoted three (3) times, including a double promotion, and was continually given more responsibility due to her achievements and high performance. Ms. Romak received eleven (11) special recognition awards and maintained a consistently high performance rating with no write-ups or negative

feedback during her time with Shell.

81.    Ms. Romak has consistently received "strong" or better performance reviews.

- 2024: Strong – job grade 4 (Line Manager and Mr. Hunt evaluated as "Higher," but Mr. Manning (UK) reduced to "Strong")
- 2023: Strong – job grade 4 (Line Manager evaluated as "Higher," but Mr. Manning (UK) reduced to "Strong")
- 2022: Strong – promoted to job grade 4

## MR. HUNT'S DISCRIMINATORY REORGANIZATION

82.    In October 2024, Mr. Hunt began planning a reorganization of the U.S.CS Team.

83.    On January 1, 2025, Mr. Hunt, the RSM, brought Ms. Chevez (Hispanic) over from the Trading & Supply organization (another team inside Shell USA). Mr. Hunt created a new Security Advisor role within the US Corporate Security Team for Ms. Chevez, which raised costs and increased the budgetary needs for U.S.CS.

84.    Ms. Chevez had begun working with Shell, USA Inc. in approximately August 1997 and continued through May of 2011 as a Shell Administrative Assistant (basic admin duties), in a starting pay grade.

85.    From May 2011 through September 2021, she was promoted to Security Assurance Analyst, where her duties included administrative tasks such as uploading security risk assessments to SharePoint, booking meetings, and sending reminders. During this time, she had no physical security duties, nor was she trained on them at a basic level. From approximately May 2011 through September 2021,

15

she was at a lower pay grade, Pay Grade 6.

86.    From October 2021 through January 1, 2025, Ms. Chevez worked as a Security Advisor for Trading and Supply within Shell USA, Inc. She was only responsible for this one business unit's assets, which were almost all terminals.

87.    While Ms. Chevez worked at Trading and Supply, Mr. Taylor trained Ms. Chevez on security risk assessments and security plans. Before his training, Ms. Chevez did not know how to do a security risk assessment.

88.    Upon joining Corporate Security, U.S.CS, Ms. Chevez had no executive protection experience or event protection experience of any kind.

89.    On or about January 1, 2025, Mr. Hunt hired Ms. Chevez without notifying Mr. Hutt, the line manager for the new role and the U.S. Country Security Manager for Corporate Security at Shell, USA, Inc., violating Shell protocols.

90.    On January 9, 2025, after onboarding Ms. Chevez, Mr. Hunt announced in an email that a reorganization was occurring.

91.    When Ms. Chevez first joined U.S.CS on January 1, 2025, she was not asked to do a Written Assessment to join or apply for the position.

92.    A discussion was never held with the U.S.CS Team about possibly relocating for the new roles. Nor was Human Resources made available to Plaintiffs or others in USCS to respond to any questions about possible relocations.

93.    The job postings indicated, "Grading decisions will also depend on other factors," without indicating what those might be.

94.    On or about January 8, 2025, Mr. Taylor and Ms. Romak began to notice that Mr. Hunt was not following standard protocols and appeared to give preferential treatment to employees of color and non-Americans. Plaintiffs filed internal complaints with Human Resources (HR).

95.    Mr. Hunt directed Mr. Colombo, the Regional Security Advisor, to coach and prepare Ms. Chevez for the interview process.

- The first coaching session occurred on January 15th at 3–4 pm.
- The second coaching session was on January 22nd at 2–3 pm.
- The third coaching session was on January 29th from 2 pm–3 pm.
- The fourth coaching session was January 30th at 10 –11 am
- The fifth coaching session was on February 6th at 11-11:30 am (Also day of 1st Initial Interview)
- The sixth coaching session was scheduled for February 12th at 2 –3 pm.
- The seventh coaching session was scheduled for February 19th at 2–3 pm.
- The Eighth coaching session was scheduled for February 20th at 10 –11 am.
- The ninth coaching session was scheduled for February 26th at 2–3 pm.

96.    Neither Mr. Hunt nor anyone else offered Mr. Taylor or Ms. Romak equivalent coaching opportunities.

97.    In the call on January 9, Mr. Hunt, the RSM, told Plaintiffs that a "Written Assessment" would be used to screen applicants.

98.    On January 23, 2025, Mr. Hunt told Mr. Taylor that he had to reapply for his current role because "others had expressed interest in the role," and "**was looking to diversify the talent."**

99.    Only the remaining White employees on the team, including Ms. Romak and Mr. Taylor, were required to reapply for their current roles and to select backup roles in other regions.

100.    Ms. Chevez was instructed to apply only for the Houston-based Security Advisor South role.

101.    The other employees (all persons of color already in U.S.CS) were not required to reapply for their current roles or to select backups in the RSM's reorganization, including Ms. Chevez, Mr. Erazo, Ms. Olivarez, Mr. Colombo, and Ms. De los Rios.

102.    On February 4, 2025, Ms. Olivarez sent Mr. Taylor a Microsoft Teams message that read, "Just a heads up, Wayne would like a DE&I presentation (20 Minutes) for our regional call."

103.    On February 7, 2025, Mr. Hunt defended his disregard for the employee and incumbent preferences by stating that there were high levels of interest in the positions.

104.    Shell policy does not authorize the elimination of the incumbent and employee preferences due to high interest in the position.

105.    On February 7, 2025, Mr. Hunt emailed applicants, including Taylor and Romak, to notify them that completing written assessments would be the next step in their application process.

106.    Mr. Hunt previously attempted to use a Written Assessment, but U.S.

H.R. prevented using written assessments because they violated Shell policy.

107.   On February 11, 2025, Ms. Chevez was allowed to take her written assessment from home, while Ms. Romak and Mr. Taylor were both required to take their assessments in the office.

108.   While Ms. Chevez could take her written assessment without intrusion or interruption, Mr. Hunt interrupted Ms. Romak and Mr. Taylor at least twice. He glared at Ms. Romak and Mr. Taylor during their in-office written assessments, attempting to intimidate them and undermine their performance.

109.   Despite doing well on the written assessments in this challenging situation, both were denied the Houston-based Security Advisor South role, which was instead given to Ms. Chevez.

110.   The RSM determined that Ms. Romak and Mr. Taylor's Line Manager, Mr. Hutt (a White male), the Country Security Manager, was to be replaced by Mr. Jackson, a Black male.

111.   Mr. Jackson came from a Lagos, Nigeria, expatriate assignment in Business Integrity and lacked substantial experience in the security of persons and assets.

112.   In Mr. Jackson's role in Lagos, he primarily investigated complaints of fraud, rather than working on the protection of physical assets and company executives.

113.   Mr. Hutt, a Shell employee for nearly fifteen (15) years who held the

Country Security Manager role for eight (8) years, should have been listed as a preferred candidate for that role. He was not and was instead discharged on June 1, 2025.

114.    Others in the Corporate Security group who were of a different racial or ethnic group were not even required to resubmit for their positions in the alleged "reorganization," but all three White American employees were required to do so.

115.    On February 18, 2025, Mr. Hunt interviewed Ms. Romak for the reorganization after work hours.

116.    On March 3, 2025, Ms. Romak received a letter stating that she had not been selected to continue in her role.

117.    Also on March 3, 2025, Ms. Romak received notification that her internal complaint had been denied.

118.    On the same day, Mr. Taylor was notified that his internal complaint had been denied.

119.    In the "reorganization," Mr. Hunt created new location-based positions for U.S.CS, including a regional "Security Advisor South" position based in Houston, a regional "Security Advisor East" position based in Pennsylvania, and a regional "Security Advisor West" position based in California. He also promoted Ms. Velazquez to the Country Security Manager position in Mexico.

120.    Until this "reorganization," Shell's U.S.CS headquarters had been in Houston, and all employee U.S. Security Advisors were based there.

121. Ms. Velazquez, a Hispanic female, was announced as the Security Advisor West on March 17, 2025.

122. Ms. Velazquez was not eligible to serve in this role, as she is not a U.S. citizen and failed to meet even that most basic qualification.

123. Mr. Hunt, ultimately realizing this, announced that Ms. Velazquez would instead become Mexico's country security manager on March 20, 2025, three days after naming her Security Advisor West.

124. When Ms. Velazquez was appointed to the Mexico Country Security Manager role, she was not asked to take a Written Assessment to join or apply for the position.

125. On March 20, 2025, Mr. Hunt emailed the Corporate Security team to announce the new positions: Ms. Chevez for South Security Advisor, Mr. Erazo for West Security Advisor, Mr. Taylor for East Security Advisor, and Ms. Velazquez for Country Security Manager (CSM) for Mexico.

126. On March 26, Mr. Manning announced the three new Security Advisor Roles and Ms. Romak's and Mr. Hutt's departures to the entire organization.

127. Mr. Taylor had applied for "Security Advisor South," the Houston-based role, as his first choice, "Security Advisor West" as his second-choice job, and "Security Advisor East" as his third-choice job.

128. Mr. Hunt chose Ms. Chevez, a Hispanic female who does not have Mr. Taylor's certifications or qualifications, to fill the Security Advisor South role, which

was most equivalent to Mr. Taylor's Houston pre-reorganization role.

129.   Indeed, since this decision was made, Mr. Taylor has repeatedly been asked to perform duties belonging to Ms. Chevez (like guarding the CEO when he was in the region) because it was well known that she could not fulfill those duties.

130.   Likewise, Mr. Taylor was passed over for the Security Advisor West role in favor of Ms. Velazquez, another less qualified Hispanic female.

131.   After that, Mr. Hunt announced that Mr. Erazo (a Hispanic male contractor and non-Shell employee) would serve as the Security Advisor West.

132.   In so doing, Mr. Hunt declined to apply "the employee preference," which would have required him to select current Shell employees over contractors or external hires.

133.   Had Mr. Taylor been given the Security Advisor West position, Ms. Romak would have been placed in the Security Advisor East position and not terminated.

134.   Mr. Hutt (Mr. Taylor and Ms. Romak's former supervisor) stated that both were more qualified than Erazo and had demonstrated superior performance.

135.   Mr. Hunt also selected Erazo despite the fact that in December of 2024, Mr. Hutt, then Country Security Manager, was preparing to terminate Mr. Erazo's contract for lack of performance.

136.   However, despite this documented history of poor performance and his status as a mere contractor, Mr. Hunt placed Mr. Erazo in a job Mr. Taylor applied

for, for which Mr. Taylor was significantly more qualified.

137.    Since taking on his role on August 19, 2025, Erazo has asked for Mr. Taylor's assistance at U.S.CS, explaining that he has never done a Security Assessment or Security Plan for Executive Protection and has never seen one.

138.    Mr. Hunt's hiring of Erazo over existing Shell employees violated clear Shell policy that allowed Mr. Hunt to hire an outside applicant only if no qualified Shell employees applied for the position.

139.    Because the Defendants made employment decisions based on race, color, and national origin, Ms. Romak was not selected for any roles and Shell discharged her on June 1, 2025.

140.    Before Ms. Romak's discharge, Shell did not consider her status as a qualified covered veteran as defined by VEVRAA, 38 U.S.C. § 4212(a)(3).

141.    Shell has government contracts in excess of $100,000.00; thus, VEVRAA requires it to "take affirmative action to employ and advance in employment" qualified covered veterans like Ms. Romak.

142.    This reorganization was done with reckless indifference and willfully and wantonly in violation of Mr. Taylor and Ms. Romak's rights, as set forth but as highlighted below:

- Shell DEI policies, together with Defendant Hunt's statements that "others had expressed interest in the role" and "Shell was looking to diversify the talent," show that Shell intentionally applied racially

discriminatory standards.

- The White applicants faced different requirements and treatment, including the lack of coaching lessons, the process of written assessments, the requirement to apply for back-up roles, and re-interview for roles. At the same time, the Defendants ignored Shell policies, such as the employee and incumbent preference.

- Ms. Romak is a military veteran who had served in a time of war, a fact that does not appear to have even been considered by Defendants, despite Shell receiving government contracts for oil, which subjects it to VEVRAA.

- Despite this reorganization being announced on January 9, 2025, Mr. Hunt approved Mr. Taylor's relocation to Pennsylvania only on *July 10, 2025*, on an "expedited" basis, after Mr. Taylor told Mr. Hunt that his mother had died and requested bereavement leave. Mr. Hunt knew there was no Shell office for Taylor to move to, and that Kevin would personally need to find a new home to work from remotely, while selling his current home, yet upon news of Kevin's mother's death, he suddenly expedited the move.

- Defendant Hunt gave both Plaintiff Romak and Mr. Hutt tear jars before their imminent departures from Shell, a vessel designed to hold the tears of its owner, showing the intent to mock employees who had

24

just been eliminated due to their race, color, ethnicity, and/or national origin.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Civil Rights Act of 1866, 42 U.S.C. §1981
### *(Both Plaintiffs)*

143.    Plaintiffs repeat and reassert each and every allegation in paragraphs above as if fully set forth herein at length.

144.    42 U.S.C. § 1981 prohibits racial discrimination in employment.

145.    Defendants conspired and agreed to eliminate and/or deny employment positions to Mr. Taylor and Ms. Romak based on race, color, ethnicity, or national origin.

146.    Mr. Taylor was the most qualified to remain in Houston as Security Advisor South and to get Security West but was denied that opportunity due to his race and national origin.

147.    Mr. Taylor should never have been subject to this "diversity" based reorganization.  As part of this reorganization, Shell selectively forced certain employees, including Ms. Romak and other White American employees, to reapply for their own positions, while exempting others.

148.    Further, Mr. Taylor was more qualified than the people of color who received those positions, including Ms. Chevez, Ms. Velasquez, and/or Mr. Erazo for

the Security Advisor South and West positions, but Mr. Taylor was denied that opportunity due to his race, color, ethnicity, and/or national origin.

149.  Ms. Romak was more qualified than Ms. Chevez for the Security Advisor South role based in Houston. Despite different and more difficult circumstances and the lack of coaching sessions, she excelled on her written assessment.

150.  Ms. Romak should also have received the benefits of VEVRAA, 38 U.S.C. § 4212(a), based on Shell's obligation to "employ and advance in employment" qualified covered veterans like herself. The fact that she was terminated *despite* VEVRAA further shows that she was terminated for discriminatory reasons.

151.  Mr. Romak should not have been subject to this "diversity"-based reorganization. As part of this reorganization, Shell selectively forced certain employees, including Ms. Romak and other White American employees, to reapply for their positions.

152.  Defendants, jointly and severally, knowingly and intentionally violated Section 1981 by demoting Mr. Taylor to Security Advisor East and forcing him to move from headquarters in Houston, Texas, to an off-site location in Montgomery County, Pennsylvania, because of his race, color, ethnicity, and/or national origin.

153.  Despite DEI protocols from leadership, Defendants, jointly and severally, offered no training to corporate security employees, including Mr. Hutt, Mr. Taylor, and Ms. Romak, to explain civil rights laws in the United States compared to those in the U.K.

154.    Shell leadership, including Mr. Manning, promotes race as a motivating factor in employment practices, as shown in Shell's Annual Report (2024).

155.    Defendants, jointly and severally, knowingly and intentionally violated Section 1981 by wrongfully denying Ms. Romak a position as Security Advisor, due to her race, color, ethnicity, and/or national origin.

156.    Defendants, jointly and severally, knowingly and intentionally violated Section 1981 by wrongfully discharging Ms. Romak as a Security Advisor in Houston, Texas, and terminating her from Shell, USA, Inc., because of her race, color, ethnicity, and/or national origin.

157.    Defendants, jointly and severally, have acted with malice and/or reckless indifference to Mr. Taylor's and Ms. Romak's rights and thus have caused them to be damaged.

## COUNT II
### Title VII of the Civil Rights Act of 1965, 42 U.S.C. §§ 2000e *et seq.*
*Race, Ethnicity, National Origin, and Color as Motivating Factors in Employment Practices*
*(Plaintiff Taylor)*

158.    Plaintiffs repeat and reassert each and every allegation in paragraphs above as if fully set forth herein at length.

159.    Mr. Taylor is a White male.

160.    Mr. Taylor was better qualified for the positions for which he applied.

161.    Despite being significantly more qualified, the Defendants, jointly and severally, including through Mr. Hunt's intentional actions, selected lesser-qualified

and even unqualified people of color, including Ms. Chevez, Ms. Velazquez, and Mr. Erazo, over Mr. Taylor because of his race, color, ethnicity, and/or national origin.

162.    On March 20, 2025, Mr. Hunt emailed the Corporate Security team to announce the new positions: Ms. Chevez for Security Advisor South, Mr. Erazo for Security Advisor West, Mr. Taylor for Security Advisor East, and Ms. Velazquez for Country Security Manager (CSM) for Mexico.

163.    On March 26, 2025, Mr. Manning announced the three new Security Advisor Roles and Ms. Romak's and Mr. Hutt's departures to the entire organization.

164.    Further, a pattern and practice of discrimination occurred at Shell USA and Corporate Security, including Defendants' January 2025 reorganization, which resulted in the involuntary transfer of Mr. Taylor to a less desirable role that is an effective demotion. And, Mr. Hunt had previously, in or about 2021 or 2022, replaced a Regional Security Advisor (JG2), previously held by a White American male based in Houston, with Mr. Colombo, a Latin American male from Argentina. Further, Mr. Hunt also had replaced the U.S. Intel Analyst, previously held by a White American male, with Ms. De los Rios, an Intel Analyst based in Mexico and a non-U.S. Citizen. And Mr. Hutt, a White American Male, the Country Security Manager, was replaced by a Black American male. Further, there are other Shell divisions, where a pattern and practice can be shown.

165.    Before this reorganization, Mr. Hunt also had replaced the U.S. Intel Analyst, previously held by a White American male, with Ms. De los Rios, an Intel

Analyst based in Mexico and a non-U.S. Citizen.

166.    Mr. Hunt further admitted that he sought to "diversify the talent…," which, together with the Shell Defendants' policies on DEI stated above, shows that the Defendants intentionally sought to promote people of color over White people.

167.    As a result of this discrimination, Mr. Taylor is being transferred and demoted, while they denied Mr. Taylor a promotion to which he was entitled.

168.    It required him to relocate to Pennsylvania and did not promote him, whereas the Defendants promoted Ms. Velazquez and are paying Mr. Erazo a higher rate under his contract.

169.    It further increases Mr. Taylor's personal costs to live and work in Pennsylvania, to work remotely, in a home he does not yet have, compared to living in the Houston, Texas, area, and working at Headquarters. Further, Mr. Taylor owns a home in Texas, which he now must sell to find a home in Pennsylvania.

170.    Mr. Hunt approved this relocation to Pennsylvania by email, on July 10, 2025, on an "expedited" basis, mere hours after Mr. Taylor told Mr. Hunt that his mother had died and requested bereavement leave.

171.    Mr. Taylor's required transfer to Pennsylvania constitutes harm inflicted on Mr. Taylor. *See Muldrow v. St. Louis*, 601 U.S. 346, 355 (2024) ("Many forced transfers leave workers worse off respecting employment terms or conditions. After all, a transfer is not usually forced when it leaves the employee better off.") (cleaned up).

172.  Mr. Taylor has complied with Title VII's charge filing provisions, 42 U.S.C. §§ 2000e-5(e)(1) and (f)(1).

173.  Mr. Taylor filed a timely charge of discrimination against Shell with the Equal Employment Opportunity Commission.

174.  The United States Equal Employment Opportunity Commission issued Mr. Taylor a Determination and Notice of Rights letter.

175.  Defendants were motivated by their desire to replace White employees in the U.S.CS with persons of color, and discriminated against Mr. Taylor concerning his compensation, terms, conditions, or privileges of employment because of his race, color, ethnicity, and/or national origin.

176.  The Supreme Court and the Fifth Circuit clearly state, "evaluating a person by ancestry instead of by his or her own merit reinforces pernicious stereotypes and demeans the dignity and worth of the individual." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 220 (U.S. 2023); *Price v. Valvoline, L.L.C.*, 88 F. 4th 1062, 1068 (5th Cir. 2023).

177.  Further, "Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 801 (U.S. 1973).

178.  The Supreme Court, on June 5, 2025, explained that,

"we rejected that argument, holding that "Title VII prohibit[ed] racial discrimination against the white petitioners in th[at] case upon the same standards as would be applicable were they Negroes." *Id.*, at 280, 96 S.Ct. 2574 (emphasis added); see also id., at 279, 96 S.Ct. 2574 (citing favorably the Equal Employment Opportunity Commission's view that Title VII bars discrimination

"against whites on the same terms as racial discrimination against nonwhites"). *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310, 145 S. Ct. 1540, 1546, 221 L. Ed. 2d 929 (2025) (citing *McDonald v. Santa Fe Trail Transportation Co.,* 427 U. S. 273 (1976)) (emphasis added).

179.    Defendants' actions, jointly and severally, as described herein, constitute race-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, including 42 U.S.C. § 2000(e)-2(a), and have caused Mr. Taylor to be damaged, including loss of past income, benefits, and future income. Defendants, jointly and severally, have acted with malice and/or reckless indifference to Mr. Taylor's rights, and thus have caused him to be damaged.

## <u>COUNT III</u>
### Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e *et seq.* *Race, Ethnicity, National Origin, and Color as Motivating Factors in Employment Practices* *(Plaintiff Romak)*

180.    Plaintiff repeats and reasserts each allegation in the paragraphs above as if fully set forth herein.

181.    Ms. Romak is a White female.

182.    Ms. Romak was significantly more qualified for the positions she applied for, having served in the United States Air Force and having many certifications specific to the role. Ms. Chevez lacked these key certifications at the time of her hire into Corporate Security and had no experience in Executive Protection or Event Protection.

183.    Ms. Romak, despite facing materially worse circumstances, did

excellently on her Written Assessment.

184.    Despite being significantly more qualified for the positions and the extra consideration to which she was entitled under VEVRAA, Ms. Romak was removed from her prior position and not selected for any of the positions for which she applied. This resulted in her termination from Shell.

185.    Defendants, jointly and severally, prioritized the hiring of people of color and ethnic minorities over White employees, constituting both evidence of intentional discrimination and showing a Pattern and Practice of discrimination based on her race, color, ethnicity, and/or national origin.

186.    On January 23, 2025, Mr. Hunt told Mr. Taylor he sought to "*diversify the team.*"

187.    Shell offered no training to corporate security employees, including Mr. Hutt, Mr. Taylor, and Ms. Romak, to explain civil rights laws in the United States compared to those in the U.K.

188.    Shell leadership, including Mr. Manning, promotes race as a motivating factor in employment practices, as shown in Shell's Annual Report (2024).

189.    On March 20, 2025, Mr. Hunt emailed the Corporate Security team to announce the new positions: Ms. Chevez for South Security Advisor, Mr. Erazo for West Security Advisor, Mr. Taylor for East Security Advisor, and Ms. Velazquez for Country Security Manager (CSM) for Mexico.

190.    On March 26, 2025, Mr. Manning announced the three new Security

Advisor Roles and Ms. Romak's and Mr. Hutt's departures to the entire organization.

191.    Defendants denied Ms. Romak any position, giving her notice of Discharge or Termination on the same day that Human Resources denied her early January 2025 internal complaint, which cited to the EEOC and bias, reflecting retaliation in violation of Title VII (described in the next count), in addition to her discrimination claims.

192.    Mr. Hunt gave Ms. Romak a tear jar before her departure.

193.    A tear jar is a vessel designed to hold the tears of its owner, and the "gift" was intended to mock and belittle Ms. Romak, who had just been fired due to her race. The "gift" was designed to insult.

194.    Ms. Romak filed a timely charge of discrimination and retaliation against Shell with the Equal Employment Opportunity Commission, complying with Title VII's charge filing provisions, 42 U.S.C. §§ 2000e-5(e)(1) and (f)(1).

195.    The United States Equal Employment Opportunity Commission issued a Determination and Notice of Rights letter, a right-to-sue letter, to Ms. Romak.

196.    Defendants, jointly and severally, motivated by the desire to replace White employees in the USCS Team with "diverse" employees, discriminated against Ms. Romak concerning her compensation, terms, conditions, or privileges of employment because of her race, color, ethnicity, and/or national origin.

197.    Defendants jointly and severally have acted with malice and/or reckless indifference to Ms. Romak's rights and thus have caused her to be damaged.

**COUNT IV**
**Retaliation**
**Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e-3**
*(Plaintiff Romak)*

198.   Plaintiffs repeat and reassert each allegation in the paragraphs above as if fully set forth herein.

199.   Near the beginning of the reorganization, on January 23, 2025, Ms. Romak submitted an internal complaint alleging policy violations in the reorganization process and alleging that Mr. Hunt had engaged in racial discrimination.

200.   That complaint alleged that the reorganization was a potential EEOC violation and seemed to exhibit bias.

201.   This constitutes a protected activity under 42 U.S.C. § 2000e-3 because Ms. Romak thereby "opposed a[] practice made an unlawful employment practice by this subchapter."

202.   Ms. Romak was required to *reapply* for her own position. The selection process lacked transparency, abandoning its internal preference policies, including *"incumbent preference"* and *"employee preference,"* which previously guaranteed a legitimate opportunity for retention.

203.   On March 3, 2025, Ms. Romak was notified that she would not receive any role in the reorganization, and on March 20, 2025, she was informed that she would be terminated effective June 1, 2025.

204.   On the same day, March 3, 2025, Ms. Romak was also personally notified that her internal complaint had been denied.

205.   Defendants jointly and severally retaliated against Ms. Romak because she reported Mr. Hunt's unlawful discriminatory practices, adversely affecting her employment.

206.   Accordingly, through the RSM's actions, Shell engaged in retaliatory behavior violating 42 U.S.C. § 2000e-3.

207.   Ms. Romak filed a timely charge of discrimination and retaliation against Shell with the Equal Employment Opportunity Commission, complying with Title VII's charge filing provisions, 42 U.S.C. §§ 2000e-5(e)(1) and (f)(1).

208.   Ms. Romak received a Determination and Notice of Rights letter from the United States Equal Employment Opportunity Commission.

## COUNT V
### Retaliation
**Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e-3**
*(Plaintiff Taylor)*

209.   Plaintiffs repeat and reassert each allegation in the paragraphs above as if fully set forth herein.

210.   When interviewed by Shell investigators pursuant to Ms. Romak's January 23, 2025, complaint, Mr. Taylor alleged that Mr. Hunt was engaged in race-based discrimination in favor of Hispanic employees and against White employees, including both Ms. Romak and Mr. Taylor.

211.   This constitutes a protected activity under 42 U.S.C. § 2000e-3 because Ms. Romak "opposed a[] practice made an unlawful employment practice by this subchapter."

212.   After Mr. Taylor cooperated with the investigation of Ms. Romak's complaint against Mr. Hunt for racial discrimination, he was passed over for his preferred job and thereby harmed.

213.   Mr. Hunt also retaliated against Mr. Taylor because he had reported Mr. Hunt's unlawful discriminatory practices and had his employment adversely affected.

214.   Accordingly, through Mr. Hunt's actions, Defendants jointly and severally engaged in retaliatory behavior violating 42 U.S.C. § 2000e-3.

215.   Mr. Taylor filed a timely charge of discrimination and retaliation against Shell with the Equal Employment Opportunity Commission, complying with Title VII's charge filing provisions, 42 U.S.C. §§ 2000e-5(e)(1) and (f)(1).

216.   The United States Equal Employment Opportunity Commission issued Mr. Taylor a Determination and Notice of Rights letter.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Kevin Taylor and Ms. Michelle Romak respectfully request that this Court enter judgment in their favor and against Defendant Shell, USA, Inc., Shell PLC, and Defendant Wayne Hunt, and provide the following relief:

A.  A declaratory judgment that Shell, Mr. Hunt and Shell, PLC. violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq., with respect to both Plaintiffs.

B.  A declaratory judgment that all Defendants violated the Civil Rights Act of 1866, 42 U.S.C. §1981, with respect to both Plaintiffs.

C.  An order for such relief, including lost back pay and front pay, and lost benefits, loss of career progression, emotional distress, reputational harm, and related consequential losses, such that Plaintiffs Kevin Taylor and Michelle Romak can be made whole for Shell's conduct; including compensatory damages; punitive damages; and prejudgment and post-judgment interest.

D.  Reasonable costs and expenses of this action, including attorneys' fees, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1988, and any other applicable laws.

E.  Such other relief as the Court deems appropriate and just.

## JURY DEMAND

Plaintiffs, Mr. Taylor and Ms. Romak, demand a trial by Jury on all issues so triable.

DATED this 5th day of September 2025.

> */s/ Sean C. Timmons*
> Sean C. Timmons
> Managing Partner, Tully Rinckey PLLC
> Texas Bar No.: 24067908
> S.D. Texas Bar No: 2100785
> 18722 University Blvd., Ste. 235
> Sugar Land, TX 77479
> (832) 240-3273 Phone
> (832) 241-5998 FAX
> Stimmons@tullylegal.com
> *Attorney-in-Charge for Plaintiffs*
>
> And
>
> Julia Z. Haller*, DC Bar No. 466921

37

Jacob P. Meckler,* DC Bar No. 90005210
America First Legal Foundation
611 Pennsylvania Ave. SE #231
Washington, D.C. 20003
Juli.Haller@aflegal.org
Jacob.Meckler@aflegal.org


*Pro Hac Vice application forthcoming**